**F I L E D**
CLERK, U.S. DISTRICT COURT

9/2/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ vav _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>         v.<br><br>KAREN SARKISYAN,<br>  aka "Kevin Sarkisyan,"<br>GAYK AKHSHARUMOV, and<br>BABKEN CHALKADRYAN,<br><br>    Defendants. | CR 21-424(A)-SVW<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 641: Theft of Government Property; 18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering; 18 U.S.C. § 1957: Money Laundering; 18 U.S.C. § 1956(a)(1)(B)(i): Concealment Money Laundering; 18 U.S.C. §§ 981 and 982 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

     The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this First Superseding Indictment:

The Defendants and Relevant Entities

1.   Defendant KAREN SARKISYAN, also known as "Kevin Sarkisyan," was a resident of Glendale, California.

2.   Defendant GAYK AKHSHARUMOV was a resident of Sherman Oaks, California.

3.   Defendant BABKEN CHALKADRYAN was a resident of Van Nuys, California.

4.   San Gabriel Hospice and Palliative Care, Inc. ("San Gabriel"), was a hospice agency located at 427 South Victory Boulevard, Burbank, California 91502.  San Gabriel discharged all patients and ceased operating in or around July 2019.

5.   Ownership and managing control of San Gabriel purportedly changed from defendant SARKISYAN to Nominee Owner 1, a resident of Glendale, California, on or about December 1, 2017.  However, thereafter, defendant SARKISYAN remained San Gabriel's beneficial owner, manager, and consultant and continued to control and be a signatory on San Gabriel's Wells Fargo business checking account ending in x0164 (the "San Gabriel Account").

6.   Defendant AKHSHARUMOV was also a beneficial owner and manager of San Gabriel.

7.   Broadway Hospice, Inc. ("Broadway Hospice"), was a hospice agency located at 225 East Broadway, Suite 305-G,

Glendale, California 91205.  Broadway Hospice discharged all patients and ceased operating in or around May 2021.

8.    Nominee Owner 2 was a resident of Glendale, California and purportedly an owner and manager of Broadway Hospice from in or around February 2019 to in or around April 2020.

9.    Beginning on or about April 23, 2020, defendant CHALKADRYAN was a listed owner of Broadway Hospice and was a signatory on a business checking account ending in x0309 in the name of Broadway Hospice held at a bank in Los Angeles County (the "Broadway Hospice Account").

10.  Defendant SARKISYAN was a beneficial owner, manager, and consultant for Broadway Hospice.

11.  Defendant AKHSHARUMOV was also a beneficial owner and manager of Broadway Hospice.

The Medicare Program

12.  The Medicare Program ("Medicare") was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

13.  Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each beneficiary was given a unique health insurance claim number.

14.  Hospice, home health agencies, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare were referred to as Medicare "providers."

15.  To participate in Medicare, Medicare required prospective providers to be licensed by a state or local agency. After obtaining the applicable license, Medicare required prospective hospice and home health providers to submit an application in which the prospective provider agreed to: (a) comply with all Medicare-related laws and regulations, including the Federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)), which prohibits the offering, paying, soliciting, or receiving of any remuneration in exchange for a patient referral or referral of business for which payment may be made by any Federal health care program; and (b) not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.  If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for the processing and payment of claims submitted by the providers.

16.  When initially enrolling or updating ownership or management information, the Provider Enrollment Application required the provider to disclose all owners and any individuals or businesses with managing control over the provider.  This disclosure obligation included any individual or entity with five percent or more ownership, managing control, or a

partnership interest, regardless of the percentage of ownership the partner had.

17. A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

18. Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that: (a) they were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) they would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) they would submit claims that were accurate, complete, and truthful.

19. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

20. A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were provided; and the name and Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI") of the physician who prescribed or ordered the services.

Hospice Services

21. Medicare coverage for hospice services was limited to situations in which: (1) the beneficiary's attending physician and the hospice medical director certified in writing that the

beneficiary was terminally ill and had six months or less to live if the beneficiary's illness ran its normal course; and (2) the beneficiary signed an election form statement choosing hospice care instead of other Medicare benefits. Hospice services reimbursed by Medicare were palliative in nature and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and bereavement services to surviving family members.  Once a beneficiary chose hospice care, Medicare would not cover treatment intended to cure the beneficiary's terminal illness.  The beneficiary had to sign and date an election form documenting this choice.  The election form had to include an acknowledgement that the beneficiary had been given a full understanding of hospice care, particularly the palliative rather than curative nature of treatment, and an acknowledgement that the beneficiary understood that certain Medicare services were waived by the election.

22.  Medicare was divided into different program "parts": Part A, Part B, Part C (or Medicare Advantage), and Part D. Medicare covered hospice services for those beneficiaries who were eligible for Medicare Part A (hospital-related services). When a Medicare beneficiary elected hospice coverage, the beneficiary waived all rights to Medicare Part B (outpatient physician services and procedures) coverage of services to treat or reverse the beneficiary's terminal illness while the beneficiary was on hospice.

23.  A beneficiary could elect to receive hospice benefits for two periods of 90 days and, thereafter, additional service for periods of 60 days per period.

24.  For the beneficiary to continue to receive hospice benefits after the second 90-day period, Medicare required that a physician re-certify that the beneficiary was terminally ill and include clinical findings or other documentation supporting the diagnosis of terminal illness.  For re-certifications, Medicare required a hospice physician or nurse practitioner to meet with the beneficiary in person and conduct a face-to-face evaluation before signing a certification of terminal illness.

B.   THE OBJECT OF THE CONSPIRACY

25.  Beginning no later than in or around January 2018, and continuing to at least in or around May 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN, AKHSHARUMOV, and CHALKADRYAN knowingly conspired with each other and others known and unknown to the Grand Jury to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

C.   THE MANNER AND MEANS OF THE CONSPIRACY

26.  The object of the conspiracy was carried out, and to be carried out, in substance as follows:

a.   Defendants SARKISYAN and AKHSHARUMOV would recruit individuals, including Nominee Owner 1, Nominee Owner 2, and defendant CHALKADRYAN, to serve as nominee owners of San Gabriel and Broadway Hospice.

b.   Defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN, along with others known and unknown to the Grand Jury, would submit and cause to be submitted false and fraudulent enrollment applications to Medicare in order to make it appear as though Nominee Owner 1 controlled and managed San

Gabriel and Nominee Owner 2 and defendant CHALKADRYAN controlled and managed Broadway Hospice, when in fact defendants SARKISYAN and AKHSHARUMOV were the beneficial owners and managers of San Gabriel and Broadway Hospice.

c.   Defendant AKHSHARUMOV, along with others known and unknown to the Grand Jury, would offer and pay kickbacks, in the form of cash, to patient recruiters for the referral of Medicare beneficiaries to San Gabriel and Broadway Hospice for hospice services, which services would then be billed to Medicare.

d.   Defendant AKHSHARUMOV knew and intended that San Gabriel and Broadway Hospice would often not provide any actual hospice services to the Medicare beneficiaries referred by patient recruiters.

e.   Defendants SARKISYAN and AKHSHARUMOV, along with others known and unknown to the Grand Jury, on behalf of San Gabriel and Broadway Hospice, would submit and cause the submission of false and fraudulent claims to Medicare for hospice services purportedly rendered to Medicare beneficiaries. In fact, as defendants SARKISYAN and AKHSHARUMOV well knew, the alleged hospice services were not medically necessary, and often not even rendered, and the referrals for those services had been procured through the payment of illegal kickbacks.

f.   Following Medicare's suspension of San Gabriel's billing privileges in or around June 2019 and in order to circumvent that payment suspension, defendants SARKISYAN and AKHSHARUMOV, along with others known and unknown to the Grand Jury, would discharge Medicare beneficiaries and cause them to

be discharged from San Gabriel and then re-enrolled with
Broadway Hospice in order to continue submitting false and
fraudulent claims to Medicare.

27. As a result of the submission of these false and
fraudulent claims, Medicare paid San Gabriel approximately
$3,668,050.

28. As a result of the submission of these false and
fraudulent claims, Medicare paid Broadway Hospice approximately
$5,375,678.

COUNTS TWO THROUGH FIVE

[18 U.S.C. §§ 1347, 2]

[ALL DEFENDANTS]

29.  The Grand Jury re-alleges paragraphs 1 through 24 and 26 through 28 of this First Superseding Indictment here.

A.   THE SCHEME TO DEFRAUD

30.  Beginning no later than in or around January 2018, and continuing to at least in or around May 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN, together with others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly, willfully, and with intent to defraud, executed and willfully caused to be executed a scheme and artifice: (a) to defraud Medicare, a health care benefit program, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare, a health care benefit program, by means of materially false and fraudulent pretenses, representations, and promises and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

B.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

31.  The scheme operated, in substance, as described in paragraph 26 of this First Superseding Indictment.

C.   EXECUTIONS OF THE FRAUDULENT SCHEME

32.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN,

together with others known and unknown to the Grand Jury, each
aiding and abetting one another, knowingly and willfully
executed and willfully caused to be executed the fraudulent
scheme described above by submitting and causing to be submitted
to Medicare the following false and fraudulent claims:

| COUNT | MEDICARE BENEFICIARY | CLAIM NUMBER | DATE CLAIM SUBMITTED | APPROX. AMOUNT BILLED |
|-------|----------------------|--------------|---------------------|-----------------------|
| TWO | C.B. | 21900300208004 | 1/3/2019 | $1,681 |
| THREE | G.M. | 21900700307204 | 1/7/2019 | $1,936 |
| FOUR | L.T. | 21917000128804 | 6/19/2019 | $2,181 |
| FIVE | G.M. | 21933800421604 | 12/4/2019 | $2,030 |

COUNTS SIX AND SEVEN

[18 U.S.C. §§ 1343, 2(a)]

[Defendants SARKISYAN and AKHSHARUMOV]

33.  The Grand Jury repeats paragraphs 1 through 11 of this First Superseding Indictment here.

A.  ADDITIONAL INTRODUCTORY ALLEGATIONS

The CARES Act

34.  In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was designed to provide emergency financial assistance to the millions of Americans suffering due to the COVID-19 pandemic.

35.  The CARES Act established several new temporary programs and provided for expansion of others, including programs created and/or administered by HHS and the United States Small Business Administration ("SBA").

The Provider Relief Fund

36.  One source of relief provided by the CARES Act was the appropriation of moneys to help providers that were financially impacted by COVID-19, as well as to provide care to patients who were suffering from COVID-19 and compensate providers for the cost of that care (the "Provider Relief Fund").  HHS, through its agency, the Health Resources and Services Administration ("HRSA"), oversaw and administered the Provider Relief Fund.

37.  In order to rapidly provide funding to providers during the pandemic, HRSA distributed payments under the CARES Act Provider Relief Fund ("Provider Relief Fund Payment" or "Payment") to providers who: (a) billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019; (b) were not currently

12

terminated from participation in Medicare or precluded from
receiving payment through Medicare Advantage or Part D; (c) were
not currently excluded from participation in Medicare and other
Federal health care programs; and (d) did not currently have
Medicare billing privileges revoked.  Providers meeting these
criteria automatically received the Provider Relief Fund Payment
and did not have to apply for the funding but were required to
comply with the terms and conditions of the Provider Relief Fund
("Terms and Conditions") if they retained such funding.

38.  Provider Relief Fund recipients attested to their
compliance with the Terms and Conditions in one of two ways.
First, Provider Relief Fund recipients were notified that they
could submit an attestation through an online portal confirming
receipt of the funds and agreeing to the Terms and Conditions.
Second, recipients were notified that, if they kept the money
for a period that exceeded 90 days from receipt, they were
deemed to have accepted the Terms and Conditions of the Provider
Relief Fund.

39.  Providers who attested to the Terms and Conditions
acknowledged that their commitment to full compliance with the
terms and conditions was material to the HHS Secretary's
decision to disburse Provider Relief Fund Payments to them.
Providers further acknowledged that non-compliance with any Term
or Condition could cause the HHS Secretary to recoup some or all
of the Payment.

40.  Providers who attested to the Terms and Conditions
certified that they:

      a.  billed Medicare in Calendar Year 2019;

b.    provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 after January 31, 2020;

c.    were not then terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D;

d.    were not then excluded from participation in Medicare and other Federal health care programs;

e.    did not then have Medicare billing privileges revoked;

f.    would only use the Payment to prevent, prepare for, and respond to COVID-19, and that the Payment would reimburse the recipient only for health-care-related expenses or lost revenues that were attributable to coronavirus;

g.    provided information relating to the Payment that was true, accurate, and complete and that any deliberate omission, misrepresentation, or falsification of any information was punishable by, inter alia, criminal penalties, including but not limited to imprisonment; and

h.    would maintain appropriate records and cost documentation to substantiate the reimbursement of costs under the disbursement.

The Small Business Administration

41.   The SBA was an agency of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

42.  As part of this effort, the SBA enabled and provided for loans through financial institutions, such as banks, credit unions, and other lenders, that had government-backed guarantees.  The SBA also provided direct loans.

The Paycheck Protection Program

43.  Another form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses.  This financial relief was referred to as the Paycheck Protection Program ("PPP").

44.  To obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  Such certifications included the requirements that the applicant affirm that it "was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors" and that the PPP loan proceeds would be used "to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."  The applicant (through its authorized representative) was also required to certify that the information provided "in the application and the information provided in all supporting documents and forms [was] true and accurate in all material respects."  In the PPP loan application, the applicant was required to state, among other

things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

45.  A business's PPP loan application was received and processed, in the first instance, by a participating financial institution.  If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies.

46.  PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds toward payroll expenses.

The Economic Injury Disaster Loan Program

47.  The Economic Injury Disaster Loan Program ("EIDL") was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

48.  The CARES ACT authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

49.  To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number

of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020.  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

50.  EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided in the application about employment, revenue, and cost of goods sold, as described in paragraph 49 above.  Any funds issued under EIDL were issued directly by the SBA.

51.  EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP loan funds.

Relevant Financial Institutions

52.  "Lender 1" was a financial institution insured by the Federal Deposit Insurance Corporation ("FDIC") and an approved SBA lender of PPP loans.  Lender 1 was located in Los Angeles County and was a "financial institution" as defined in Title 18, United States Code, Section 20.

B.  THE SCHEME TO DEFRAUD

53.  Beginning no later than in or around March 2020, and continuing until at least in or around October 2020, in Los

17

1  Angeles County, within the Central District of California, and

2  elsewhere, defendants SARKISYAN and AKHSHARUMOV, together with

3  others known and unknown to the Grand Jury, each aiding and

4  abetting one another, knowingly and with intent to defraud,

5  devised, participated in, and executed a scheme to defraud a

6  financial institution, namely, Lender 1, and the SBA as to

7  material matters, and to obtain money and property owned by and

8  in the custody and control of Lender 1 and the SBA by means of

9  material false pretenses, representations, and promises, and the

10  concealment of material facts.

11  B.   MANNER AND MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

12       54.  The fraudulent scheme operated and was carried out, in

13  substance, as follows:

14            a.   Defendants SARKISYAN and AKHSHARUMOV submitted

15  and caused the submission of fraudulent applications to the SBA

16  and financial institutions under the EIDL and PPP loan programs

17  for entities they owned and controlled, including but not

18  limited to San Gabriel.

19            b.   Following the cessation of San Gabriel's

20  operations, on or about April 3, 2020, defendants SARKISYAN and

21  AKHSHARUMOV caused an application to be submitted to the SBA for

22  an EIDL loan on San Gabriel's behalf.  In that application,

23  defendants SARKISYAN and AKHSHARUMOV made and caused to be made

24  materially false statements, including false representations

25  regarding the number of employees to whom San Gabriel paid wages

26  and San Gabriel's average monthly payroll expenses at the time

27  of the application, and false certifications that the loan would

28  be used for permissible business purposes, even though

18

1 defendants SARKISYAN and AKHSHARUMOV knew that, at the time, San

2 Gabriel was no longer in operation.

3      c. Following the cessation of San Gabriel's

4 operations, on or about April 20, 2020, defendants SARKISYAN and

5 AKHSHARUMOV also caused an application to be submitted to Lender

6 1 for a PPP loan on behalf of San Gabriel.  In that application,

7 defendants SARKISYAN and AKHSHARUMOV made and caused to be made

8 materially false statements to Lender 1, including: (i) false

9 representations that San Gabriel was in operation on February

10 15, 2020, and had employees for whom San Gabriel paid salaries

11 and payroll taxes or paid independent contractors; (ii) false

12 representations regarding the number of employees to whom San

13 Gabriel paid wages and San Gabriel's average monthly payroll

14 expenses at the time of the application; and (iii) false

15 certifications that the loan would be used for permissible

16 business purposes, even though defendants SARKISYAN and

17 AKHSHARUMOV knew that, at the time, San Gabriel was no longer in

18 operation.

19      d. As a result of and in reliance on these false and

20 fraudulent representations and certifications in the PPP loan

21 application, Lender 1 deposited approximately $50,000 in PPP

22 loan proceeds into the San Gabriel Account.

23      e. Defendants SARKISYAN and AKHSHARUMOV, together

24 with other co-schemers, transferred and caused to be transferred

25 the PPP loan proceeds into bank accounts that defendants

26 SARKISYAN and AKHSHARUMOV and their co-schemers controlled,

27 where those proceeds were used for expenses different from those

28 defendants SARKISYAN and AKHSHARUMOV certified (and the PPP

program required) that the proceeds would be used for, including expenses incurred for defendants SARKISYAN and AKHSHARUMOV's own personal benefit and for the benefit of their co-schemers.

C.   USE OF THE WIRES

55.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendants SARKISYAN and AKHSHARUMOV, together with others known and unknown to the Grand Jury, transmitted and caused the transmission of the following items by means of wire communication in interstate commerce:

| COUNT | DATE | INTERSTATE WIRE TRANSMISSION |
|-------|------|------------------------------|
| SIX | 4/3/20 | Submission of EIDL Application on behalf of San Gabriel, sent by means of interstate wire, to the SBA. |
| SEVEN | 5/7/20 | Transfer of approximately $50,000 in PPP loan proceeds from Lender 1, sent by means of interstate wire, into the San Gabriel Account. |

COUNTS EIGHT THROUGH FOURTEEN

[18 U.S.C. §§ 641, 2]

[Defendants SARKISYAN and AKHSHARUMOV]

56.   The Grand Jury re-alleges paragraphs 1 through 11, and 34 through 40 of this First Superseding Indictment here.

A.   ADDITIONAL INTRODUCTORY ALLEGATIONS

57.   Trimax Wellness, Inc. was a corporation using an address at 1200 S. Brand Blvd., Suite 148, Glendale, California 91204.  Chalkadryan was a corporate officer of this entity.

58.   Avayco was purportedly a corporation using an address at 1522 W. Glenoaks Blvd., Unit G, Glendale, California 91201.

59.   Optimum Billing Solutions, Inc., was a corporation using an address at 1980 Rangeview Drive, Glendale, California 91201.

60.   Palliative Enterprises, Inc. was a corporation using an address at 1146 North Central Avenue, Unit 335, Glendale, California 91202.

61.   Desert Oasis Group, Inc., was a corporation licensed with the California Department of Cannabis Control and using an address at 68031 Ramon Road, Unit 201, Cathedral City, California 92234.

B.   THEFT OF GOVERNMENT PROPERTY

62.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN and AKHSHARUMOV, each aiding and abetting one another, knowingly and willfully stole, purloined, and converted to their own use and the use of another, and without authority, conveyed and disposed of, money and a thing

of value greater than $1,000 from HHS, a department of the
United States, namely, the following amounts of an approximately
$91,483.60 payment from the HHS Provider Relief Fund that was
deposited into the San Gabriel Account on or about April 17,
2020, with the intent to deprive HHS of the use and benefit of
that money.  Defendants SARKISYAN and AKHSHARUMOV did so,
knowing that San Gabriel was not entitled to these Provider
Relief Funds and that they did not use the funds to prevent,
prepare for, or respond to COVID-19, or reimburse San Gabriel
for health-care-related expenses or lost revenue attributable to
COVID-19, as required under the terms and conditions applicable
to the Provider Relief Fund payments:

| COUNT | DATE | APPROX. AMOUNT | DESCRIPTION |
|---|---|---|---|
| EIGHT | 4/20/20 | $9,625 | Check #11285 from the San Gabriel Account deposited into a Comerica Bank account in the name of Trimax Wellness, Inc. |
| NINE | 4/20/20 | $9,850 | Check #11283 from the San Gabriel Account deposited into a Comerica Bank account in the name of Trimax Wellness, Inc. |
| TEN | 4/20/20 | $16,325 | Check #11293 from the San Gabriel Account deposited into a Wells Fargo bank account in the name of Optimum Billing Solutions, Inc. |
| ELEVEN | 4/21/20 | $11,675 | Check #11296 from the San Gabriel Account deposited into a Wells Fargo bank account in the name of Optimum Billing Solutions, Inc. |

| COUNT | DATE | APPROX. AMOUNT | DESCRIPTION |
|---|---|---|---|
| TWELVE | 4/21/20 | $2,205.01 | Check #11284 from the San Gabriel Account deposited into a bank account in the name of Avayco. |
| THIRTEEN | 4/21/20 | $15,000 | Check #11289 from the San Gabriel Account issued to Palliative Enterprises, Inc. |
| FOURTEEN | 4/21/20 | $20,000 | Check #11295 from the San Gabriel Account deposited into a Salal Credit Union bank account in the name of Desert Oasis Group, Inc. |

COUNT FIFTEEN

[18 U.S.C. § 1956(h)]

[ALL DEFENDANTS]

63.  The Grand Jury re-alleges paragraphs 1 through 32, 34 through 35, and 41 through 55 of this First Superseding Indictment here.

A.  ADDITIONAL INTRODUCTORY ALLEGATIONS

64.  Sarkisyan Consulting, Inc., was a corporation using an address at 1241 South Glendale Avenue, Glendale, California 91205.  Defendant SARKISYAN was a corporate officer of this entity.

65.  R Gen, Inc., was a corporation using an address at 1417 West Kenneth Road, Suite B, Glendale, California 91201.  Defendant CHALKADRYAN and Nominee Owner 1 were the purported owners of this entity.

66.  Hazelhurst REM, LLC, was a limited liability company using an address at 1241 South Glendale Avenue, Suite 302, Glendale, California 91205.  Defendant SARKISYAN was a corporate officer of this entity.

67.  MACH Holdings, LLC, was a limited liability company using an address at 840 West Glenoaks Boulevard, Glendale, California 91202.

B.  THE OBJECTS OF THE CONSPIRACY

68.  Beginning no later than in or around January 2018 and continuing through until at least in or around May 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN conspired with one another and with others known and unknown to

24

the Grand Jury to commit the following offenses against the United States:

a.   to knowingly conduct and attempt to conduct a financial transaction involving the proceeds of specified unlawful activity, that is, health care fraud conspiracy, health care fraud, and wire fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.   to knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, conspiracy to commit health care fraud, health care fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957.

C.   THE MANNER AND MEANS OF THE CONSPIRACY

69.   The objects of the conspiracy were carried out, and to be carried out, in substance as follows:

a.   Defendants SARKISYAN and AKHSHARUMOV, together with others known and unknown to the Grand Jury, submitted and caused the submission of false and fraudulent claims to Medicare, which caused Medicare to wire fraud proceeds to the San Gabriel Account and the Broadway Hospice Account.

b.   Defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN, together with others known and unknown to the Grand Jury, transferred and caused the transfer of the fraud proceeds, including in financial transactions of $10,000 and greater, to

25

secondary accounts under their control, in order to conceal the true nature, location, source, ownership, and control of the funds.

       c.   Defendants SARKISYAN and AKHSHARUMOV, together with others known and unknown to the Grand Jury, submitted and caused the submission of fraudulent PPP and EIDL loan applications, which caused Lender 1 to wire loan proceeds to the San Gabriel Account.

       d.   Defendants SARKISYAN and AKHSHARUMOV, together with others known and unknown to the Grand Jury, transferred and caused the transfer of the PPP loan proceeds, including in financial transactions of $10,000 and greater, to secondary accounts under their control, and in order to conceal the true nature, location, source, ownership, and control of the funds.

       e.   Defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN, together with others known and unknown to the Grand Jury, spent the Medicare fraud proceeds for their own personal benefit and for the benefit of others.

       f.   Defendants SARKISYAN and AKHSHARUMOV, together with others known and unknown to the Grand Jury, spent the PPP loan proceeds for their own personal benefit and for the benefit of others, including for expenses prohibited under the requirements of the PPP program.

COUNTS SIXTEEN THROUGH EIGHTEEN

[18 U.S.C. §§ 1957, 2]

[ALL DEFENDANTS]

70.  The Grand Jury re-alleges paragraphs 1 through 32, 34 through 35, 41 through 55, and 63 through 69 of this First Superseding Indictment here.

71.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN, and others known and unknown to the Grand Jury, knowing that the funds involved represented the proceeds of some form of unlawful activity, engaged in the following monetary transactions by, through, and to a financial institution, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, which property was, in fact, derived from a specified unlawful activity, namely, conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and wire fraud, in violation of Title 18, United States Code, Section 1343, as charged in Counts One, Two through Five, and Six through Seven of this First Superseding Indictment, respectively:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| SIXTEEN | 8/28/18 | Transfer of $50,000 from the San Gabriel Account by means of check to Sarkisyan Consulting, Inc. |
| SEVENTEEN | 5/23/19 | Transfer of $13,400 from the San Gabriel Account by means of check to R Gen, Inc. |
| EIGHTEEN | 7/28/20 | Transfer of $20,000 from the Broadway Hospice Account by means of check to Desert Oasis Group, Inc. |

COUNTS NINETEEN THROUGH TWENTY-ONE

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2]

[ALL DEFENDANTS]

72.  The Grand Jury re-alleges paragraphs 1 through 1 through 32, 34 through 35, 41 through 55, and 63 through 69 of this First Superseding Indictment here.

73.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants SARKISYAN, AKHSHARUMOV and CHALKADRYAN, and others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly conducted, and willfully caused others to conduct, a financial transaction involving the proceeds of specified unlawful activity, that is, conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, health care fraud, in violation of Title 18, United States Code, Section 1347, and wire fraud, in violation of Title 18, United States Code, Section 1343, as charged in Counts One, Two through Five, and Six through Seven, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of such proceeds:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| NINETEEN | 5/13/20 | Transfer of $14,000 from the San Gabriel Account by means of check to Optimum Billing Solutions, Inc. |
| TWENTY | 7/16/20 | Transfer of $5,800 from the Broadway Hospice Account by means of check to MACH Holdings, LLC |
| TWENTY-ONE | 11/2/20 | Transfer of $60,000 from the Broadway Hospice Account by means of check to the Hazelhurst REM, LLC |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982]

1.    Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Five of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished

in value; or (e) has been commingled with other property that
cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction of the offenses set forth in any of Counts Six or Seven of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished

31

1   in value; or (e) has been commingled with other property that

2   cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Eight through Fourteen of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished

33

1   in value; or (e) has been commingled with other property that

2   cannot be divided without difficulty.

FORFEITURE ALLEGATION FOUR

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of the offenses set forth in any of Counts Fifteen through Twenty-One of this First Superseding Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered,

however, where the convicted defendant acted merely as an
intermediary who handled but did not retain the property in the
course of the money laundering offense unless the defendant, in
committing the offense or offenses giving rise to the
forfeiture, conducted three or more separate transactions
involving a total of $100,000.00 or more in any twelve-month
period.

                        A TRUE BILL


                        _____/s/_____
                        Foreperson

STEPHANIE S. CHRISTENSEN
Acting United States Attorney


SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds Section


LORINDA I. LARYEA
Acting Chief, Fraud Section
U.S. Department of Justice

PATRICK J. QUEENAN
ALEXANDRA MICHAEL
Trial Attorneys, Fraud Section
U.S. Department of Justice